IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


SPYROS GARIFALAKIS,                        3:16-cv-01051-BR

        Plaintiff,                     OPINION AND ORDER

v.

NANCY A. BERRYHILL,[1]
Acting Commissioner, Social
Security Administration,

        Defendant.


**MERRILL SCHNEIDER**
Schneider Kerr Law Offices
P.O. Box 14490
Portland, OR 97293
(503) 255-9092

        Attorneys for Plaintiff

**BILLY J. WILLIAMS**
United States Attorney
**JANICE E. HEBERT**
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR  97204-2902
(503) 727-1003

---

    [1]  On January 23, 2017, Nancy A. Berryhill was appointed the
Acting Commissioner of the Social Security Administration and
pursuant to Federal Rule of Civil Procedure 25(d) is substituted
as Defendant in this action.


1 - OPINION AND ORDER

**DAVID MORADO**
Regional Chief Counsel
**THOMAS M. ELSBERRY**
Special Assistant United States Attorney
Social Security Administration
701 5th Avenue, Suite 2900, M/S 901
Seattle, WA 98104
(206) 615-2112

        Attorneys for Defendant


**BROWN, Judge.**

Plaintiff Spyros Garifalakis seeks judicial review of the final decision of the Commissioner of the Social Security Administration (SSA) in which she denied Plaintiff's applications for Disability Insurance Benefits (DIB) under Title II of the Social Security Act and Supplemental Security Income (SSI) under Title XVI of the Social Security Act. This Court has jurisdiction to review the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

For the reasons that follow, the Court **AFFIRMS** the decision of the Commissioner and **DISMISSES** this matter.


### ADMINISTRATIVE HISTORY

Plaintiff protectively filed his applications for DIB and SSI on May 29, 2013. Tr. 28, 219, 221.[2] Plaintiff alleged a disability onset date of January 1, 2009. Tr. 28, 219, 221.

---

[2] Citations to the official transcript of record filed by the Commissioner on November 30, 2016, are referred to as "Tr."

Plaintiff's applications were denied initially and on
reconsideration. An Administrative Law Judge (ALJ) held a
hearing on August 25, 2015. Tr. 48. Plaintiff and a vocational
expert (VE) testified. Plaintiff was represented by an attorney
at the hearing.

On October 6, 2015, the ALJ issued an opinion in which he
found Plaintiff is not disabled and, therefore, is not entitled
to benefits. Tr. 28-40. On April 5, 2016, the Appeals Council
denied Plaintiff's request to review the ALJ's decision, and the
ALJ's decision became the final decision of the Commissioner.
Tr. 1-5. *See Sims v. Apfel*, 530 U.S. 103, 106-07 (2000).

On June 9, 2016, Plaintiff filed a Complaint in this Court
seeking review of the Commissioner's decision.


## BACKGROUND

Plaintiff was born on March 31, 1967. Tr. 219, 221.
Plaintiff was 48 years old at the time of the hearing. Plaintiff
has at least a sixth-grade education. Tr. 54, 240. The ALJ
found Plaintiff has past relevant work experience as a forklift
operator, warehouse worker, stocking clerk, and "delivery/route
driver." Tr. 39, 78-79.

Plaintiff alleges disability due to bipolar disorder,
attention-deficit hyperactivity disorder (ADHD), anxiety,
fibromyalgia, coronary artery disease, chronic obstructive

pulmonary disorder (COPD), personality disorder, a brain aneurysm, headaches, stroke, and temporomandibular joint disorder (TMJ). Tr. 239.

Except as noted, Plaintiff does not challenge the ALJ's summary of the medical evidence. *See* Tr. 30-39. After carefully reviewing the medical records, this Court adopts the ALJ's summary of the medical evidence.

## STANDARDS

The initial burden of proof rests on the claimant to establish disability. *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012). To meet this burden, a claimant must demonstrate his inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The ALJ must develop the record when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence. *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011)(quoting *Mayes v. Massanari,* 276 F.3d 453, 459-60 (9th Cir. 2001)).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42

U.S.C. § 405(g). *See also Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1161 (9th Cir. 2012). Substantial evidence is "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Molina*, 674 F.3d. at 1110-11 (quoting *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009)). It is more than a mere scintilla [of evidence] but less than a preponderance. *Id.* (citing *Valentine*, 574 F.3d at 690).

The ALJ is responsible for evaluating a claimant's testimony, resolving conflicts in the medical evidence, and resolving ambiguities. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). The court must weigh all of the evidence whether it supports or detracts from the Commissioner's decision. *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). Even when the evidence is susceptible to more than one rational interpretation, the court must uphold the Commissioner's findings if they are supported by inferences reasonably drawn from the record. *Ludwig v. Astrue*, 681 F.3d 1047, 1051 (9th Cir. 2012). The court may not substitute its judgment for that of the Commissioner. *Widmark v. Barnhart*, 454 F.3d 1063, 1070 (9th Cir. 2006).

## DISABILITY ANALYSIS

### I.   The Regulatory Sequential Evaluation

At Step One the claimant is not disabled if the Commissioner determines the claimant is engaged in substantial gainful activity (SGA).  20 C.F.R. §§ 404.1520(a)(4)(I), 416.920(a)(4)(I).  *See also Keyser v. Comm'r of Soc. Sec.*, 648 F.3d 721, 724 (9th Cir. 2011).

At Step Two the claimant is not disabled if the Commissioner determines the claimant does not have any medically severe impairment or combination of impairments.  20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  *See also Keyser*, 648 F.3d at 724.

At Step Three the claimant is disabled if the Commissioner determines the claimant's impairments meet or equal one of the listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  *See also Keyser*, 648 F.3d at 724.  The criteria for the listed impairments, known as Listings, are enumerated in 20 C.F.R. part 404, subpart P, appendix 1 (Listed Impairments).

If the Commissioner proceeds beyond Step Three, she must assess the claimant's residual functional capacity (RFC).  The claimant's RFC is an assessment of the sustained, work-related physical and mental activities the claimant can still do on a

regular and continuing basis despite his limitations.  20 C.F.R. §§ 404.1520(e), 416.920(e).  *See also* Social Security Ruling (SSR) 96-8p.  "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent schedule."  SSR 96-8p, at *1.  In other words, the Social Security Act does not require complete incapacity to be disabled.  *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1234-35 (9th Cir. 2011)(citing *Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir. 1989)).

At Step Four the claimant is not disabled if the Commissioner determines the claimant retains the RFC to perform work he has done in the past.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  *See also Keyser*, 648 F.3d at 724.

If the Commissioner reaches Step Five, she must determine whether the claimant is able to do any other work that exists in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  *See also Keyser*, 648 F.3d at 724-25.  Here the burden shifts to the Commissioner to show a significant number of jobs exist in the national economy that the claimant can perform. *Lockwood v. Comm'r Soc. Sec. Admin.*, 616 F.3d 1068, 1071 (9th Cir. 2010).  The Commissioner may satisfy this burden through the testimony of a VE or by reference to the Medical-Vocational Guidelines set forth in the regulations at 20 C.F.R. part 404, subpart P, appendix 2.  If the Commissioner meets this burden,

the claimant is not disabled.  20 C.F.R. §§ 404.1520(g)(1),
416.920(g)(1).


## ALJ'S FINDINGS

At Step One the ALJ found Plaintiff has not engaged in
substantial gainful activity since January 1, 2009, the alleged
onset date.  Tr. 30.

At Step Two the ALJ found Plaintiff has the severe
impairments of status-post cerebral vascular accident, late
effects of a cerebrovascular disease, poly-substance abuse and
dependence, and mood disorder.  Tr. 30-32.

At Step Three the ALJ concluded Plaintiff's medically
determinable impairments do not meet or medically equal one of
the listed impairments in 20 C.F.R. part 404, subpart P,
appendix 1.  Tr. 33.  The ALJ found Plaintiff has the RFC to
perform medium work except that Plaintiff must avoid concentrated
exposure to fumes, dusts, orders, gases, and pulmonary irritants
and must avoid all exposure to heights and hazards.  The ALJ also
found Plaintiff has the ability to perform simple, routine work
with a specific vocational preparation of 1 or 2, and he can have
"occasional, indirect contact with coworkers" but not any contact
with the public.  Tr. 32-38.

At Step Four the ALJ concluded Plaintiff is incapable of
performing his past relevant work.  Tr. 38-39.

At Step Five the ALJ found Plaintiff could perform other jobs that exist in the national economy, including hand-packager and laundry laborer. Tr. 39-40. In the alternative, even if Plaintiff was limited to light work, the ALJ found he could still perform other jobs that exist in the national economy, including room cleaner and agricultural sorter. Tr. 40. Accordingly, the ALJ found Plaintiff is not disabled. Tr. 40.

## DISCUSSION

Plaintiff contends the ALJ erred when he (1) did not find various conditions to be "severe" at Step Two; (2) discredited Plaintiff's testimony; (3) discredited the global assessment of functioning (GAF) scores assigned to Plaintiff; (4) discredited the opinions of nonexamining psychiatrists Joshua J. Boyd, Psy.D., and Dorothy Anderson, Ph.D.; (5) discredited the opinion of Daniel Wardin, PLC, one of Plaintiff's treating mental-health providers; and (6) discredited the testimony of lay witness Argyro Apostolou, Plaintiff's cousin.

## I.   Step Two

Plaintiff contends the ALJ erred when he failed to find the following impairments were severe at Step Two:    (1) history of gunshot wound, (2) left-shoulder degenerative changes, (3) carpal-tunnel syndrome, (4) chronic pain syndrome, (5) chronic head pain and migraines, (6) degenerative changes in

spine, (7) psychotic disorder, (8) anxiety disorder, (9) TMJ, (10) history of coronary artery disease, and (11) fibromyalgia.

At Step Two the claimant is not disabled if the Commissioner determines the claimant does not have any medically severe impairment or combination of impairments. *Stout v. Comm'r Soc. Sec Admin.*, 454 F.3d 1050, 1052 (9th Cir. 2006). *See also* 20 C.F.R. § 416.920(a)(4)(ii); *Keyser v. Comm'r of Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). A severe impairment "significantly limits" a claimant's "physical or mental ability to do basic work activities." 20 C.F.R. §§ 416.921(a), (b). Such abilities and aptitudes include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; using judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting. *Id.*

The Step Two threshold is low:

> [A]n impairment can be considered as not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work . . . . [T]he severity regulation is to do no more than allow the Secretary to deny benefits summarily to those applicants with impairments of a minimal nature which could never prevent a person from working.

SSR 85-28, at *2 (Nov. 30, 1984)(internal quotations omitted).

The Ninth Circuit has held when the ALJ has resolved Step

Two in a claimant's favor, any error in designating specific impairments as severe at Step Two is harmless if the ALJ, nonetheless, accounted for the limitation imposed by that condition in his assessment of the claimant's RFC. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

In his Opening Brief Plaintiff does not provide any meaningful substantive argument to support his contention that the ALJ erred when he did not find the eleven listed impairments were severe at Step Two. Instead Plaintiff merely lists each of the conditions together with references to page numbers in the record that Plaintiff apparently contends support his unelucidated claim that the ALJ erred when he did not find each of those impairments to be severe. *See* Pl.'s Opening Brief (#14) at 10-11. This Court, sitting in an appellate capacity, cannot consider arguments "'that are not specifically and distinctly argued in an appellant's opening brief.'" *Carmickle v. Comm'r Soc. Sec. Admin.*, 553 F.3d 1155, 1161 n.2 (9th Cir. 2008)(quoting *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1164 (9th Cir. 2003)). By failing to provide any substantive argument in support of his various Step Two claims, Plaintiff leaves Defendant and the Court to guess as to Plaintiff's contentions based on mere citations to pages in the record. Plaintiff, therefore, falls well short of "specifically and distinctly"

presenting these arguments to this Court. *See Carmickle*, 553 F.3d at 1161 n.2.

Accordingly, on this record the Court will not consider Plaintiff's Step Two arguments.

## II. **Plaintiff's Testimony**

As noted, Plaintiff next contends the ALJ erred when he discredited Plaintiff's testimony.

In *Cotton v. Bowen* the Ninth Circuit established two requirements for a claimant to present credible symptom testimony: The claimant must produce objective medical evidence of an impairment or impairments, and he must show the impairment or combination of impairments could reasonably be expected to produce some degree of symptom. *Cotton*, 799 F.2d 1403, 1407 (9th Cir. 1986). *See also Spelatz v. Astrue*, 321 F. App'x 689, 692 (9th Cir. 2009). The claimant, however, need not produce objective medical evidence of the actual symptoms or their severity. *Smolen v. Chater,* 80 F.3d 1273, 1284 (9th Cir. 1996). *See also Delgado v. Commissioner of Social Sec. Admin.*, 500 F. App'x 570, 570 (9th Cir. 2012).

If the claimant satisfies the above test and there is not any affirmative evidence of malingering, the ALJ can reject the claimant's pain testimony only if she provides clear and convincing reasons for doing so. *Parra v. Astrue,* 481 F.3d 742, 750 (9th Cir. 2007)(citing *Lester v. Chater*, 81 F.3d 821, 834

(9th Cir. 1995)).  General assertions that the claimant's
testimony is not credible are insufficient.  *Id*.  The ALJ must
identify "what testimony is not credible and what evidence
undermines the claimant's complaints."  *Id*. (quoting *Lester*,
81 F.3d at 834).

At the August 25, 2015, hearing Plaintiff testified he only
completed the sixth grade due to the fact that he was "always in
trouble because [he] couldn't learn."  Tr. 54.  Plaintiff stated
he was laid off from his previous job as a forklift driver
because of the poor economy and he was laid off from a previous
job as a "merchandiser" when the company he was working for went
bankrupt.  Tr. 56-57.  After Plaintiff was laid off from his job
as a forklift driver, he collected unemployment benefits.  He
remembered certifying that he was able and willing to work, but
he stated he "didn't realize the problems [he] was having" at the
time.  Tr. 71-72.

Plaintiff stated he attempted to obtain his high-school
equivalency degree, but he was unable to complete the course
work.  Tr. 55.  Plaintiff also stated he cannot perform everyday
mathematical calculations such as the amount of change he would
receive if he paid for a $3.00 meal with a $5.00 bill.  Tr. 55.
Plaintiff testified he can only walk one-half of a block before
he has to stop because his "back starts hurting."  Tr. 59.
Plaintiff stated he is unable to hold a cup of coffee because his

"hands go numb" and because of shoulder pain.  Tr. 60.  Plaintiff
stated he can sit in a chair for 20 minutes "at the most."
Tr. 62.

Plaintiff testified he "can't handle being around people,"
and his daily anxiety, which he rates as between seven and nine
on a ten-point scale, causes him to be unable to sit still and
unable to concentrate on a task for more than ten minutes.
Tr. 68, 73-74.  In addition, Plaintiff stated he "can't remember
certain things" and although he can "remember [his] past," he
cannot "remember this last few years."  Tr. 76-77.

Plaintiff stated he does not cook.  Tr. 63.  Although he
tries to do yard work, including mowing the lawn and "cut[ting]
the bushes," he "does not weed."  Tr. 63.  Plaintiff stated on a
normal day he "pick[s] up a couple cans" for approximately six to
eight hours per day in order to earn money, and he rides the bus
and his bicycle in order to collect the cans.  Tr. 64-65.

Plaintiff testified he uses methamphetamine "[o]nce a day"
to help manage his ADHD, but he does not use a lot at a time.
Tr. 66, 72.  Plaintiff stated he uses marijuana occasionally and
has used cocaine in the past, but he quit after he had his first
child.  Tr. 67.  Plaintiff testified he has not used heroin.
Tr. 67.

In an Adult Function Report dated July 23, 2013, Plaintiff
reported in a typical day he goes to medical and mental-health

appointments; visits his case manager, alcohol and drug manager, and parole officer; goes to school to obtain his high-school equivalency; picks up bottles and cans; and takes medications. Tr. 274. Plaintiff indicated he did not have a problem with personal care and preparing simple meals. Tr. 275. Plaintiff stated he is able to count change, but is unable to manage bills, a savings account, or a checking account. Tr. 277. Plaintiff indicated his hobbies include playing computer games, playing slot machines and gambling, and riding his bicycle. Tr. 277.

Plaintiff stated his conditions affect his abilities to lift, squat, bend, stand, reach, walk, sit, kneel, talk, climb stairs, see, remember, complete tasks, concentrate, understand and follow instructions, and get along with others. Tr. 278. Plaintiff reported he can walk one block before back pain requires him to rest for five minutes. Tr. 278. Plaintiff stated he cannot pay attention for "very long" because he loses "concentration right away," has difficulty understanding written instructions, and follows spoken instructions only 25 percent of the time. Tr. 278.

The ALJ discredited Plaintiff's testimony because (1) Plaintiff's daily activities belie the alleged severity of his conditions; (2) Plaintiff's employment immediately preceding his alleged period of disability ended for nondisability reasons and Plaintiff sought and obtained unemployment benefits during

that alleged period of disability; (3) the medical evidence does not support Plaintiff's alleged severity; and (4) Plaintiff demonstrated a lack of candor regarding his drug use and secondary-gain motivations, including drug-seeking behavior, for accessing medical resources.[3]

## A.    Activities of Daily Living

The Social Security Act does not require claimants to be utterly incapacitated to be eligible for benefits.  *Molina*, 674 F.3d at 1112.  Nonetheless, to the extent that those daily activities contradict other testimony or "meet the threshold for transferable work skills," the ALJ may rely on the claimant's reported activities as a basis to discredit the claimant's testimony.  *See Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007).

Here the ALJ reasonably found Plaintiff's reported activities contradicted his testimony in multiple respects. Tr. 34.  The ALJ noted Plaintiff's statements in June 2012 that he was able to work in the kitchen, to lift weights, and to play softball while in prison were inconsistent with his testimony in 2013 and 2015 regarding his severe physical limitations. Tr. 1112, 1119.  The ALJ also found Plaintiff's testimony that he

---

[3] The ALJ also discredited Plaintiff's testimony because Plaintiff's "extensive, recurring poly-substance abuse and dependence raises a significant credibility concern."  Tr. 35. The mere fact that Plaintiff has a longstanding history of drug abuse, however, is not a clear and convincing reason for the ALJ to discredit Plaintiff's testimony.

performs yard work, including mowing lawns and trimming bushes,
was inconsistent with his allegations as to his physical
limitations, including that he was unable to hold even a cup of
coffee. Moreover, contrary to Plaintiff's testimony in August
2015 that he cannot pull weeds, Plaintiff reported to Daniel
Wardin, LPC, on June 6, 2014, that he had been "[d]oing some yard
work, pulling weeds." Tr. 2043. In addition, the ALJ noted
Plaintiff alleged severe back limitations that substantially
limited his ability to walk and to sit, but the record contains
multiple reports that Plaintiff rode his bicycle and engaged in
other physical activity. *See, e.g.*, Tr. 1245 (Plaintiff
"manages" his anxiety with "physical activity" in May 2013); 1608
(Plaintiff "riding his bike a lot" in December 2013); Tr. 2013
(Plaintiff "rode his bicycle 40 miles" to visit friends in
September 2014); Tr. 2031 (Plaintiff rode his bicycle up to ten
miles without rest in August 2014); Tr. 2044 (Plaintiff rode his
bicycle 80-100 miles per week in May 2014). The ALJ, therefore,
reasonably discredited Plaintiff's testimony on the basis that it
was inconsistent with Plaintiff's reported activities.

**B.   Nondisability Employment Termination and Unemployment
Benefits**

As noted, the ALJ also discredited Plaintiff's allegation of
disability beginning on January 1, 2009, on the bases that
Plaintiff's employment immediately preceding that date ended for
nondisability reasons and that Plaintiff sought and obtained

unemployment benefits after that date.

An ALJ may discredit the claimant's testimony by citing a
claimant's nondisability reasons for leaving employment
immediately preceding the alleged onset date of disability. *See
Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001). *See also
Page v. Colvin*, 620 F. App'x 605, 605 (9th Cir. 2015). In
addition, "receipt of unemployment benefits can undermine a
claimant's alleged inability to work fulltime" if the record
establishes the claimant "held himself out as available for
full-time or part-time work." *Carmickle*, 533 F.3d at 1161-62.

The ALJ is correct that Plaintiff's employment before his
alleged onset date ended because Plaintiff was laid off as a
result of the economy rather than due to his physical or mental
inability to work. Tr. 56-57, 575. Moreover, the ALJ correctly
noted Plaintiff applied for and received unemployment benefits
from 2009 through at least July 2011 (Tr. 71-72, 553, 1044), and
Plaintiff admitted at the hearing that if he had been offered his
job as a forklift driver during that period, he would have
accepted the position. Tr. 72. Plaintiff attempted to explain
that he "didn't realize the problems [he] was having. I was
having major migraine headaches after my aneurism." Tr. 72.
This explanation, however, strains credulity because there is
nothing in the nature of migraine headaches that would render an
individual latently disabled. Accordingly, Plaintiff's

explanation at the hearing does not undermine the ALJ's finding that Plaintiff held himself out as available for work during the alleged period of disability because it is supported by substantial evidence in the record.

The Court, therefore, concludes the ALJ appropriately discredited Plaintiff's allegations of disability on the basis of Plaintiff's nondisability reasons for leaving his job as a forklift driver and his receipt of unemployment benefits during the alleged period of disability.

### C.    Inconsistency with Medical Evidence

As noted, the ALJ also discredited Plaintiff's testimony on the basis that the alleged severity of his conditions is not supported by the medical record.

On May 30, 2009, Plaintiff suffered an aneurysm that required surgery and a ten-day hospitalization.  Tr. 835. Nonetheless, by June 17, 2009, Plaintiff was "doing very well" and requested and received a note clearing him to return to work. Tr. 833.  Thereafter, Plaintiff went to the emergency room on numerous occasions complaining of headaches.  Imaging of Plaintiff's brain, however, was consistently stable and did not show a return of the aneurysm.  *See, e.g.*, Tr. 718, 737, 754, 762, 815, 839, 1556.  Moreover, during some of those emergency-room presentations Plaintiff appeared to be attempting to obtain narcotic pain medication, exaggerating symptoms, or leaving

abruptly against medical advice. *See, e.g.*, Tr. 582-83
(Plaintiff presented to emergency room with a headache, but
demanded discharge against medical advice after being denied
narcotics); Tr. 586 (Plaintiff's "severe headaches" entirely
dissipated during interview in emergency department); Tr. 1438
(Despite stating his headache severity was an eight on a ten-
point scale, Plaintiff observed to be "watching TV and smiling
appropriately and really appears very comfortable and very
engaged in the movie he is watching"); Tr. 1454-64 (Plaintiff
presented to the emergency room with headaches, but Plaintiff
abruptly left stating "he needed to leave the hospital to attend
to his cat" even though he stated he was homeless. Provider
noted Plaintiff's actions "raised a diagnostic question about
malingering.").

Moreover, there were multiple other instances in which
Plaintiff's allegations were contradicted by the medical record.
For example, despite telling a treatment provider on February 11,
2014, that he was "[n]ot able to grip or close hands," he
demonstrated "good" grip strength in both hands on examination.
Tr. 2074. In addition, Plaintiff's report in his July 2013 Adult
Function Report and testimony in August 2015 that he suffered
from severe back pain that prevented him from walking more than
one-half or one block or from sitting for extended periods of
time is contradicted by his report to a treatment provider on

June 25, 2014, that his back pain "resolved" after he lost
weight.  Tr. 2036.  Moreover, an x-ray on July 8, 2009, revealed
only "[m]ild-moderate thoracic disc degeneration."  Tr. 1445.
On November 17, 2009, Plaintiff told Peter Hatcher, M.D., that
other physicians had told him that he has "damaged discs," but
Dr. Hatcher noted there was nothing in his chart to substantiate
that claim.  Moreover, on that day Plaintiff "[f]reely state[d]"
that if Dr. Hatcher did not provide Plaintiff with narcotic pain
medication, he would get them from somewhere else.  Tr. 1335.

     Accordingly, the Court concludes the ALJ reasonably cited
the inconsistency of Plaintiff's testimony and reports with the
medical evidence as a reason to discredit Plaintiff's testimony.

   **D.    Lack of Candor Regarding Drug Use and Secondary-Gain
           Motivations for Accessing Medical Resources**

     Finally, the ALJ also discredited Plaintiff's testimony on
the basis that Plaintiff demonstrated a lack of candor regarding
his use of drugs and demonstrated secondary-gain motives such as
drug-seeking behavior with treatment providers.

     As the ALJ noted, on numerous occasions Plaintiff made
statements regarding his drug use that were inconsistent with
other reports and drug tests or otherwise were not candid.  For
example, on March 3, 2009, Plaintiff reported "consistent use of
methamphetamine" and a history of use of cocaine, heroin,
marijuana, and alcohol.  Tr. 553.  On June 1, 2009, Plaintiff
stated he "has been using methamphetamine fairly regularly since

21 - OPINION AND ORDER

January when he lost his job." Tr. 1651. Moreover, on July 2, 2009, Plaintiff initially stated he quit using methamphetamine "some time ago" before later admitting to using methamphetamine as recently as one week before that emergency-room visit and stated he had smoked heroin in the past. Tr. 585. On July 9, 2009, however, Plaintiff "denied illicit drug use since treatment for his brain aneurysm in 05/2009." Tr. 1472. Notably, at the hearing Plaintiff also stated he had never used heroin. Tr. 67.

On July 2, 2011, an emergency-room provider noted Plaintiff appeared to be under the influence of stimulants even though Plaintiff denied using stimulants. Tr. 870. That day, however, Plaintiff tested positive for amphetamines. Tr. 870. On January 7, 2011, Plaintiff stated he had not used cocaine, fentanyl, or heroin for 9-12 months, but he tested positive for cocaine that day. Tr. 910, 918. During an evaluation on March 1, 2012, Plaintiff "hint[ed] at some substance abuse," but the evaluator found Plaintiff "may not be entirely forthcoming in that arena." Tr. 1126. On July 11, 2013, Plaintiff also gave "conflicting reports about recent [drug] use." Tr. 1590. On February 8, 2013, Plaintiff stated he had not used drugs or alcohol since 2004, that he frequently used cocaine in the 1990s, methamphetamine "a few times" in his life, heroin "on and off" since 1994, and marijuana "on and off" since the age of 12. Tr. 1601. On September 19, 2014, Plaintiff was "unwilling to

specify which substances he has been most recently using."
Tr. 2009.

In addition, the ALJ correctly noted the record is replete
with instances of Plaintiff demonstrating secondary-gain motives
with treatment providers, including drug-seeking behavior.  On
July 3, 2009, Plaintiff "demanded to be discharged against
medical advice" after emergency-room personnel explained to him
that they would not prescribe narcotics for him.  Tr. 582-83.  As
the ALJ noted, on multiple occasions Plaintiff overdosed on
various prescription medications in order to avoid arrest.  *See,
e.g.*, Tr. 1061, 1120.

On July 26, 2009, Plaintiff presented to the emergency room
with the chief complaint of "I'm not doing good" and with
"thoughts of overdose."  Tr. 1447.  After examining Plaintiff,
however, the emergency-room physician stated "[i]t is likely that
the patient is using the hospital for housing."  Tr. 1448.

On August 12, 2011, Plaintiff "reported an overdose of
Doxepin," but his toxicology screen was negative for the drug.
Tr. 1003.  His treatment provider noted at the time that
Plaintiff "had a history of similar false reports in the past"
and that Plaintiff ultimately "admitted to using [the]
circumstance to get resources."  Tr. 1003.  At that time
Plaintiff was given a final diagnosis of malingering.  Tr. 1007.

During a hospitalization on August 22, 2014, Plaintiff's

treatment providers observed as follows: "While walking to the bathroom, patient abruptly fell on the ground twice, very possibly intentionally in an attempt to stay in hospital (ED MD had informed patient that patient will likely discharge today from ED)." Tr. 1831.

On August 25, 2014, Plaintiff again presented to the emergency room with depression and suicidal ideation. Tr. 1818. After Plaintiff was told he would not be prescribed benzodiazepine antidepressants, however, he stated he was "safe to go because he is not going to get any benzodiazepines here." Tr. 1818. Plaintiff's treatment provider diagnosed him with "[r]ule out malingering" and stated there "is clearly a secondary gain of him wanting benzodiazepines, which is why he is wanting to be hospitalized." Tr. 1818.

Accordingly, the Court concludes the ALJ reasonably discredited Plaintiff's testimony on the basis of his lack of candor regarding drug use as well as the secondary-gain motives that he repeatedly demonstrated while accessing health-care services. Each of these reasons considered together readily amount to clear and convincing reasons for the ALJ to discredit Plaintiff's testimony.

On this record, therefore, the Court concludes the ALJ did not err when he discredited Plaintiff's testimony because he provided legally sufficient reasons supported by substantial

evidence in the record for doing so.

### III. **Plaintiff's GAF Scores**

Plaintiff next contends the ALJ erred when he did not find Plaintiff disabled on the basis of Plaintiff's GAF scores. In particular, Plaintiff contends the ALJ erred when he did not find Plaintiff disabled on the basis of GAF scores issued on August 12, 2011 (Tr. 1020); July 9, 2009 (Tr. 1481); June 1, 2009 (Tr. 1653); and August 23, 2014 (Tr. 1826).

The Ninth Circuit, however, "has recognized that 'the Commissioner has determined the GAF scale does not have a direct correlation to the severity requirements in [the Social Security Administration's] mental disorders listings.'" *Doney v. Astrue*, 485 F. App'x 163, 165 (9th Cir. 2012)(quoting *McFarland v. Astrue*, 288 F. App'x 357, 359 (9th Cir. 2008)). *See also Cote v. Colvin*, No. 3:15-cv-00103-SI, 2015 WL 7871169, at *6 (D. Or. Dec. 4, 2015). The Ninth Circuit, therefore, has not required ALJs to provide any rationale for disregarding or discrediting a GAF score when evaluating a claimant's mental-health limitations. *See Doney*, 485 F. App'x at 165 ("We therefore hold that it was not error for the ALJ to disregard [the claimant's] GAF score.").

The ALJ in this case, nonetheless, explained:

> I find all such scores to be unpersuasive as many, if not all, occurred in the context of substance abuse and/or dependence. Moreover, these scores are likely rested, at least in part, on the claimant's subjective complaints, which are not deemed entirely credible.

Tr. 38.  As noted, the ALJ provided legally sufficient reasons for discrediting Plaintiff's testimony and correctly observed Plaintiff's GAF scores were, at the least, based partly on his subjective reporting.  Moreover, the ALJ was correct that many of Plaintiff's GAF scores were issued during the lengthy periods throughout the record in which Plaintiff was abusing and/or dependent upon drugs.

Accordingly, on this record the Court concludes the ALJ did not err when he discredited Plaintiff's GAF scores.

## IV.  Opinions of Nonexamining Psychiatrists Drs. Boyd and Anderson

Plaintiff next contends the ALJ erred when he partially discredited the opinions of nonexamining psychiatrists Joshua J. Boyd, Psy.D., and Dorothy Anderson, Ph.D.  In particular, Plaintiff contends the ALJ erred when he did not include in his assessment of Plaintiff's RFC the statements of Drs. Boyd and Anderson that Plaintiff should have an "understanding supervisor."

The ALJ "may reject the opinion of a non-examining physician by reference to specific evidence in the medical record." *Sousa v. Callahan*, 143 F.3d 1240, 1244 (9th Cir. 1998).  *See also Baxala v. Colvin*, 671 F. App'x 477, 479 (9th Cir. 2016).

The ALJ declined to include in his assessment of Plaintiff's RFC the limitation regarding the "understanding supervisor" because the ALJ did "not find this to be tantamount to a

functional limitation" insofar as "[u]nlike the other opined social limits, that comment does not address the nature and frequency of contact or interaction." Tr. 38. In addition, the ALJ noted none of Plaintiff's treatment providers identified the necessity of Plaintiff to have an understanding supervisor. The ALJ otherwise gave the opinions of Drs. Boyd and Anderson "substantial weight." Tr. 38.

The ALJ was correct that the "understanding supervisor" comment in the opinions of Drs. Boyd and Anderson is unlike the social functional limitations contained in an assessment of a claimant's RFC because it does not address the extent or nature of interaction with a supervisor, but instead applies only to the personal attributes of a potential supervisor. The ALJ found this to be ill-suited to the inherently quantitative analysis in the assessment of a claimant's RFC as well as to the analysis at Step Five of the sequential evaluation. Moreover, the ALJ was correct that none of Plaintiff's treatment providers identified his need for an understanding supervisor as a requirement for Plaintiff to be able to function in a workplace or any other similar environment.

Accordingly, on this record the Court concludes the ALJ did not err when he partially discredited the nonexamining opinions of Drs. Boyd and Anderson.

## V. __Opinion of Daniel Wardin, LPC__

Plaintiff next contends the Comissioner erred when she discredited the opinion of Daniel Wardin, LPC, dated August 21, 2015, that was first submitted to the Appeals Council after the ALJ rendered his decision. The Appeals Council reviewed LPC Wardin's opinion, but the Appeals Council found it "does not provide a basis for changing the [ALJ's] decision." Tr. 2. Accordingly, the Appeals Council declined to review the ALJ's decision. Tr. 1.

When a claimant "submits evidence for the first time to the Appeals Council, which considers that evidence in denying review of the ALJ's decision, the new evidence is part of the administrative record, which the district court must consider in determining whether the Commissioner's decision is supported by substantial evidence." *Brewes*, 682 F.3d at 1159-60, 1162-63. The Court, therefore, considers LPC Wardin's opinion when determining whether the ALJ's evaluation of the medical record is based on substantial evidence. *Id.*

LPC Wardin was Plaintiff's therapist and case manager at Cascadia Behavioral Health from May 14, 2014, to February 24, 2015. Tr. 22. LPC Wardin diagnosed Plaintiff with PTSD and major depressive disorder and stated Plaintiff's symptoms were suicidal ideation; social anxiety; "severe trauma responses"; and severe, chronic depression. Tr. 22. LPC Wardin opined Plaintiff

demonstrated "extreme" limitations in concentration, persistence, and pace; social functioning; and activities of daily living. Tr. 23. LPC Wardin also indicated Plaintiff is moderately limited in his abilities to sustain an ordinary routine without special supervision and to respond appropriately to changes in the work setting as well as markedly limited in his abilities to work in coordination with or proximity to others, to interact appropriately with the public, to accept instructions and to respond appropriately to criticism from supervisors, and to get along with coworkers or peers. Tr. 23.

At the outset the Court notes the ALJ rendered his decision based on a comprehensive review of a medical record that was over 1,700 pages long at the time of the ALJ's decision. LPC Wardin's treatment notes consist of an approximately 60-page portion of an otherwise extremely voluminous medical record. *See* Tr. 1983-2045. Moreover, after a review of LPC Wardin's records, it is clear he relied extensively on Plaintiff's subjective reporting. In light of the significant issues with Plaintiff's credibility identified by the ALJ, LPC Wardin's reliance on Plaintiff's subjective reporting casts doubt on LPC Wardin's opinion. In addition, despite repeatedly noting Plaintiff's drug abuse in his treatment records (Tr. 1985, 1991, 1994, 1998, 2003-04, 2009, 2025, 2043-44), LPC Wardin did not mention Plaintiff's substance abuse in his opinion nor explain how it affects Plaintiff's

mental limitations. In light of the prevalence of Plaintiff's drug use in the record as a whole as well as in LPC Wardin's own records, LPC Wardin's failure to account for Plaintiff's drug abuse is a serious problem with LPC Wardin's opinion. Accordingly, the Court concludes the ALJ's decision is supported by substantial evidence notwithstanding the submission of LPC Wardin's opinion to the Appeals Council.

On this record, therefore, the Court concludes the Commissioner did not err when the Appeals Council determined LPC Wardin's opinion did not provide a basis to change the ALJ's decision.

## VI. Lay-Witness Testimony of Argyro Apostolou

Finally, Plaintiff contends the ALJ erred when he discredited the lay-witness testimony of Argyro Apostolou, Plaintiff's cousin.

Lay-witness testimony regarding a claimant's symptoms is competent evidence that the ALJ must consider unless he "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." *Lewis v. Apfel,* 236 F.3d 503, 511 (9th Cir. 2001). The ALJ's reasons for rejecting lay-witness testimony must also be "specific." *Stout v. Commissioner, Social Sec. Admin.,* 454 F.3d 1050, 1054 (9th Cir. 2006). Nevertheless, an ALJ is not required to address each lay-witness statement or testimony on an "individualized,

witness-by-witness-basis.  Rather if the ALJ gives germane
reasons for rejecting testimony by one witness, the ALJ need only
point to those reasons when rejecting similar testimony by a
different witness." *Molina v. Astrue,* 674 F.3d 1104, 1114 (9th
Cir. 2012)(quotation omitted).  Germane reasons for discrediting
a witness's testimony include inconsistency with the medical
evidence and the fact that the testimony "generally repeat[s]"
the properly discredited testimony of a claimant.  *Bayliss v.
Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005).  *See also Williams
v. Astrue*, 493 F. App'x 866 (9th Cir. 2012).

Apostolou submitted a Third Party Adult Function Report
dated July 20, 2013.  Tr. 281-88.  Apostolou stated Plaintiff
"can't focus on a task and complete projects" and can only pay
attention for "a few minutes."  Tr. 281, 285.  Apostolou reported
he "must repeat and give very short instructions" in order for
Plaintiff to follow those instructions and that Plaintiff does
not get along with authority figures.  Tr. 285.  Apostolou
described Plaintiff as "emotionally volatile," stated Plaintiff
is "terrible" at handling stress, and reported Plaintiff "doesn't
get along with family members" and "always seems to have
conflicts with friends."  Tr. 285-87.

The ALJ gave Apostolou's opinion "limited weight" because
Apostolou "indicated he was 'not sure' for many of his responses
to questions regarding functioning."  Tr. 38.  In his Third Party

Function Report Apostolou answered he was "not sure" to more than a dozen questions, including relatively basic questions like whether Plaintiff had side-effects from his medications, the degree to which Plaintiff spends time with others, how far Plaintiff can walk before needing rest, and what Plaintiff does on a daily basis. The ALJ, therefore, reasonably doubted the reliability of Apostolou's opinion based on the degree to which Apostolou was unsure as to basic facts about Plaintiff's functioning.

On this record, therefore, the Court concludes the ALJ did not err when he discredited Apostolou's opinion because the ALJ provided legally sufficient reasons supported by substantial evidence in the record for doing so.

## CONCLUSION

For these reasons, the Court **AFFIRMS** the decision of the Commissioner and **DISMISSES** this matter pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

DATED this 15th day of June, 2017.


/s/ Anna J. Brown

_____
ANNA J. BROWN
United States District Judge